IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


DAVID BLACK,                                          No. 3:17-CV-1785-HZ

        Plaintiff,

    v.

HARTFORD LIFE INSURANCE                               OPINION & ORDER
COMPANY,

        Defendant.


Megan E. Glor
John C. Shaw
Megan E. Glor, Attorneys at Law, P.C.
707 NE Knott Street, Suite 101
Portland, OR 97212

       Attorneys for Plaintiff

Russell S. Buhite
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
1201 Third Avenue, Suite 5150
Seattle, WA 98101

       Attorneys for Defendant

HERNÁNDEZ, District Judge:

Plaintiff David Black brings this action against Defendant Hartford Life Insurance Company under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 (ERISA), challenging the termination of his disability insurance benefits. Both parties move for summary judgment. For the reasons that follow, Plaintiff's motion is granted and Defendant's motion is denied.

<u>BACKGROUND</u>

Plaintiff was employed by DMX Music as a Lead Customer Service Representative. Compl. ¶¶ 4–8, ECF 1. Plaintiff was diagnosed with Atypical Parkinson's Disease and obtained long-term disability (LTD) benefits beginning in December of 2005. AR[1] 133, ECF 22. Plaintiff's LTD policy is insured by Defendant Hartford, which is responsible for determining Plaintiff's eligibility for benefits and for paying benefit awards. Compl. at ¶¶ 1, 8; Glor Decl. Ex. B, at 1, ECF 16. Plaintiff was granted an initial twenty-four months of LTD benefits based on his inability to perform material duties of his "own occupation." AR 304–09. After the twenty-four month period ended, Plaintiff continued to receive benefits under the more stringent "any occupation" standard. AR 263. Plaintiff received LTD benefits for approximately nine years under the "any occupation" standard. AR 144.

From the outset of Plaintiff's LTD claim, Defendant directed Plaintiff to apply for Social Security Disability Income ("SSDI") benefits. AR 311–12. Plaintiff applied for SSDI benefits. In 2009, the Social Security Administration ("SSA") determined that Plaintiff was "unable to perform any work existing in significant numbers in the national economy" and awarded him disability benefits retroactive to February 1, 2006. AR 951. Plaintiff's retroactive SSDI benefits award offset Defendant's prior LTD benefit payments. AR 241, 927. As a result, Plaintiff's

---

[1] Citations to "AR" refer to the administrative record filed at ECF Nos. 22 and 23.

monthly LTD payments were roughly cut in half, and Plaintiff paid Defendant $24,780 out of the SSDI award to cover Defendant's overpayment. *Id.* In the seven years following the SSA's determination, the nature of Plaintiff's disabling condition was regularly confirmed by physicians and Defendant. AR 66, 80.

On November 20, 2015, Defendant's Special Investigation Unit ("SIU") began investigating Plaintiff's LTD claim. AR 617–24. Defendant hired a third-party vendor to conduct surveillance of Plaintiff. AR 660–71. The video surveillance showed Plaintiff walking with a cane, using public transportation, going to the bank, getting his hair cut, and shopping. *Id.* SIU then scheduled an interview with Plaintiff, which was conducted on March 17, 2016. AR 636–59. Defendant also hired neurologist Dr. Robert Egan to conduct an independent medical examination of Plaintiff on June 14, 2016. AR 492. Based on his examination and review of Defendant's surveillance footage, Dr. Egan concluded that Plaintiff did not have Atypical Parkinson's Disease. AR 494.

On August 31, 2016, Defendant wrote a letter to Plaintiff informing him that his LTD benefits claim had been terminated. AR 144–51. Plaintiff appealed the decision, proffering additional medical reports and letters from friends regarding his conditions and limitations. AR 3–4. Defendant denied Plaintiff's appeal. AR 3. Plaintiff then filed this lawsuit alleging that Defendant abused its discretion under ERISA when it decided to terminate his LTD benefits claim. Both Plaintiff and Defendant filed motions for summary judgment.

<u>STANDARDS</u>

Traditionally, summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

However,

> [t]raditional summary judgment principles have limited application in ERISA cases governed by the abuse of discretion standard. Where, as here, the abuse of discretion standard applies in an ERISA benefits denial case, a motion for summary judgment is, in most respects, merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.

*Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929–30 (9th Cir. 2012) (citations, quotation marks omitted). In addition, "judicial review of benefits determinations is limited to the administrative record—that is, the record upon which the plan administrator relied in making its benefits decision[.]" *Id.* at 930 (internal quotation marks omitted). "[W]hen a court must decide how much weight to give a conflict of interest under the abuse of discretion standard[,] . . . the court may consider evidence outside the [administrative] record." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006) (en banc). In considering "evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest[,]" *id.*, traditional rules of summary judgment apply, and "summary judgment may only be granted if after viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact." *Stephan*, 697 F.3d at 930 (internal quotation marks omitted). "[T]he decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." *Abatie*, 458 F.3d at 970.

DISCUSSION

## I.      Standard of Review

A denial of benefits by an ERISA plan administrator is reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility

for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489

U.S. 101, 115 (1989). The grant of discretion must be unambiguous. *Abatie*, 458 F.3d at 963.

Here, the LTD policy provides that Defendant

ha[s] full discretion and authority to determine eligibility for benefits and to
construe and interpret all terms and provisions of the Group Insurance Policy.

Black Policy 20, ECF 22-5. This language expressly confers discretion on the plan administrator.

In reviewing for an abuse of discretion, an ERISA plan administrator's decision "will not

be disturbed if reasonable." *Conkright v. Frommert*, 559 U.S. 506, 521 (2010) (internal quotation

marks omitted). This reasonableness standard requires deference to the administrator's benefits

decision unless it is "(1) illogical, (2) implausible, or (3) without support in inferences that may

be drawn from the facts on the record." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d

666, 676 (9th Cir. 2011) (internal quotation marks omitted); *see also Tapley v. Locals 302 & 612

of Int'l Union of Operating Eng'rs–Emp'rs Constr. Indus. Ret. Plan*, 728 F.3d 1134, 1139 (9th

Cir. 2013) (courts "equate the abuse of discretion standard with arbitrary and capricious

review").

Plaintiff does not contest that an abuse of discretion standard is appropriate. However,

Plaintiff does argue the Court should heighten its scrutiny because of Defendant's structural

conflict of interest.

When "the insurer acts as both funding source and administrator[,]" there is a structural

conflict of interest that "must be weighed as a factor in determining whether there is an abuse of

discretion." *Salomaa*, 642 F.3d at 674 (internal quotation marks omitted). However, structural

conflicts do not divest the administrator of its delegated discretion. *Metro. Life Ins. Co. v. Glenn*,

554 U.S. 105, 115–16 (2008). Rather, "they weigh more or less heavily as factors in the abuse of

discretion calculus." *Robertson v. Standard Ins. Co.*, 139 F.Supp.3d 1190, 1200 (D. Or. 2015);

*see also Abatie*, 458 F.3d at 967 ("We read Firestone to require abuse of discretion review whenever an ERISA plan grants discretion to the plan administrator, but a review informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record.").

The Ninth Circuit has provided guidance for applying the abuse of discretion standard when there is a structural conflict of interest. *See Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629–30 (9th Cir. 2009). Whether a plan administrator abused its discretion turns on a consideration of "numerous case-specific factors, including the administrator's conflict of interest[.]" *Id.* at 630. In making that determination, the reviewing court must weigh and balance all of the factors together. *Id.* Factors that "frequently arise" in ERISA cases include: (1) the quality and quantity of medical evidence; (2) whether the plan administrator subjected the claimant to an in-person medical evaluation or merely relied on a paper review of the claimant's existing medical records; (3) whether the administrator provided its independent experts with all of the relevant evidence; and (4) as applicable, whether the administrator considered a contrary Social Security Administration ("SSA") disability determination. *Id.* at 630. The weight assigned to the "conflict factor depends on the facts and circumstances of each particular case." *Id.*

Other factors might include inconsistent reasons for denial or evidence of malice. *Salomaa*, 642 F.3d at 674. Additionally, a "procedural irregularity" in violation of ERISA regulations "is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion." *Abatie*, 458 F.3d at 972.

Here, Defendant does not dispute that it plays a dual role as claim administrator and insurer. "Thus, the Court assesses 'the reasonableness of the plan administrator skeptically[.]'"

*Williams v. Reliance Standard Life Insurance Co.*, 164 F.Supp.3d 1230, 1246 (D. Or. 2016)

(quoting *Salomaa*, 642 F.3d at 666).

## II.     The Court assigns little weight to Defendant's structural conflict of interest.

While Hartford acknowledges there is structural conflict of interest, it disputes the extent

to which the Court should consider it as a factor in determining whether it abused its discretion

in denying Plaintiff's disability benefits. It argues that because it has "walled off" its claims

decision-makers, any structural conflict of interest deserves little, if any, weight. Def. Corrected

Mot. for Sum. Judg. 35 [hereinafter Def. Mot.], ECF 32.  It also argues that its use of third-party

vendors does not improperly influence its claims decisions. *Id.* at 36.[2]

### A.  "Walling Off Claims"

Defendant argues it has reduced any conflict by, among other things, (1) separating its

claims and appeals units; (2) not providing "incentives, remuneration, bonuses, awards,

achievements, or other recognition in whole or part upon the denial or termination of claims,"

and (3) ensuring that claims and appeals decision-makers are separate business units from the

financial and underwriting departments and are not involved in financial decisions. Def. Mot. 45.

Plaintiff disputes that Defendant has sufficiently minimized the effects of any conflict. In

particular, Plaintiff focuses on performance metrics related to the financial impact of

investigations and argues that these metrics incentivize claim termination. For example, Plaintiff

points to records that investigator Bishop was praised for meeting or exceeding referral volume

and for using "highly effective investigative strategies;" that investigator Still failed to meet her

goals for referrals and file closings, but was praised for her roundtable participation; and that

---

[2] The Court is not entirely clear on which of Plaintiff's arguments, raised throughout the briefing, are intended to address whether the conflict of interest factor deserves significant weight in the abuse of discretion analysis. The Court therefore addresses the issues identified by Defendant here and will discuss Plaintiff's remaining (and relevant) arguments in the sections that follow.

nurse Allen received an award for delivering outcomes. Glor Decl. Ex. C at 12, E at 4, Ex. G at 5, ECF 43  While the Court is not convinced there is any connection between, for example, "effective investigative strategies," participation in roundtables, and claim termination, the Court does agree that certain goals appear to incentivize referring cases for further investigation. *See, e.g.*, Glor Decl. Ex. E at 14 (investigator "made agency referrals on 46% of the matters that she closed, which is above goal"). However, further investigation does not necessarily lead to claim denial and termination.

Moreover, the Court is not convinced that these metrics alone support the speculation invited by Plaintiff. Read as a whole, the evaluations demonstrate a broad review of employee performance. For example, under the category of "Quality," employees are evaluated in part on the strategic use of surveillance resources and the timeliness of medical records requests. Glor Decl. Ex. C at 4. Under the category of "Behaviors," employees are evaluated in part on their participation in ongoing trainings and ability to maintain positive working relationships. *Id.* Under the category of "Results/production," employees are evaluated in part on the number of accepted cases and completed investigations. *Id.* Even the "financial performance" section, described as "expense management/productivity," appears to encompass a wide range of goals, which include minimizing waste, processing expense payments in a timely manner, closing investigations quickly, and reducing costs. Glor Decl. Ex. J at 9. In sum, when reviewing these evaluations as a whole, the Court finds Plaintiff's arguments speculative, and concludes that the identified metrics do not implicate a need for a heightened degree of skepticism.

### B.  MES and HUB

Plaintiff argues, in part, that Defendant's decision to terminate benefits was unreasonable because it relied on biased consultants—specifically, MES and HUB—and because these

consultants have known financial ties to Defendant.

Like in *Robertson*, Plaintiff's arguments "are speculative and conclusory." *See* 139 F.Supp.3d at 1202. "Known financial ties" alone do not support the speculation invited by Plaintiff. Plaintiff's argument that these financial ties have increased over recent years does not alter this conclusion. To the contrary, these ties could simply reflect recent court findings that the *failure* to obtain an independent medical examination (IME) weighs in favor of a finding of an abuse of discretion. *See, e.g.*, *Robertson*, 139 F.Supp. at 1205 (lack of IME weighed in favor of finding of an abuse of discretion). Because Plaintiff has identified no evidence that Defendant's contracts with either MES or HUB were dependent on the outcome of the medical opinions provided by the consulting physicians, or in some other way infiltrated with bias, this Court declines to draw an inference of nefarious or improper behavior. *See, e.g.*, *McCloud v. Hartford Life & Acc. Ins. Co.*, 910 F.Supp.2d 1226, 1230–31 (D. Or. 2012) (holding that the "bare fact" that an insurer paid for file reviews was insufficient to find that it abused its discretion).

**III.     Plaintiff Provided Proof of Ongoing Disability.**

Plaintiff bears the burden of proving ongoing disability and entitlement to LTD benefits. *Muniz v. Amec Const. Management, Inc.*, 623 F.3d 1290 (9th Cir. 2010). "Nevertheless, where an insurer has previously found a claimant to be disabled (and the insurer is not asserting that the initial determination was erroneous), the insurer's change in position requires some rational explanation." *Robertson*, 139 F.Supp.3d at 1203 (citing *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 871 (9th Cir. 2008) and *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002)). Courts in this district have explained the parties' burdens in the following way:

> Defendants here need not establish Plaintiff's condition improved or substantially changed in order for Defendants to continue to evaluate Plaintiff's eligibility for ongoing

benefits under the LTD plan and, if warranted, to decide to terminate those benefits based on the record as a whole. Nevertheless, when determining whether Defendants abused their discretion in terminating Plaintiff's benefits, the Court necessarily will consider the record as a whole including whether Plaintiff's condition improved or substantially changed between the time Defendants initially deemed her eligible for benefits and the time Defendants reversed their decision.

*Torres v. Reliance Standard Life Ins. Co.*, No. 07–CV–202–BR, 2010 WL 276074, at *8 (D. Or. Jan. 15, 2010); *Robertson*, 139 F.Supp.3d at 1203.

Here, Defendant previously found Plaintiff to be disabled and does not assert that the initial determination, or the repeated confirmations over the following nine years, were erroneous. As recently as October of 2015, Defendant noted in Plaintiff's file that:

> Expected duration of R&L: lifetime. A: Based on the diagnosis it is unreasonable to expect the EE to return to full time gainful employment . . . Claimant continues to satisfy the definition of disability. Recertify.

AR 66–67.

Since 2015, Plaintiff has been treated by three physicians: Dr. Wise, Dr. Taylor, and Dr. Maksimov. Medical records from these providers document symptoms of Atypical Parkinson's Disease, chronic pain, and intensive treatment. For example, Dr. Taylor assessed Plaintiff as suffering from "true neuropathology," in December 2015 and continued proscribing Parkinson's and migraine medications. AR 706, 709. Moreover, Dr. Wise has consistently opined that Plaintiff is completely disabled. AR 636.[3] The only provider who opined that Plaintiff was *not*

---

[3] Neither Dr. Taylor nor Dr. Maksimov were willing to opine as to whether Plaintiff was disabled under the terms of the LTD policy. In April 2016, Dr. Maksimov said he could not comment on the degree of disability and had not seen Plaintiff since January. AR 628. In May 2016, Dr. Taylor said he had not seen Plaintiff since December, had not discussed work restrictions with him, and did not review the investigative materials that Defendant provided. AR 630–31. While, in July, Dr. Taylor responded to a questionnaire from Plaintiff's attorney by indicating he believed Plaintiff was unable to work, AR 411, he later responded to a copy of Dr. Egan's report by again stating he had no opinion on Plaintiff's disability status. AR 475. The Court will not speculate, and accepts the plain meaning of each statement. Thus, the statements here of "no opinion" are just that; they are not opinions of non-disability.

disabled was Dr. Egan, the doctor hired by Defendant to conduct an IME and whose opinion is addressed below.

**IV.    Defendant' Review of Plaintiff's Claim was Unreasonable[4]**

"An administrator's decision is an abuse of discretion when it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Torres*, 2010 WL 276074 at * 9 (internal quotation marks and citation omitted). If an administrator's decision has a rational basis, a court may not substitute its judgment for that of the administrator as to a claimant's eligibility for plan benefits even if the court disagrees with the administrator's decision. *Id.* The question "is not [] whose interpretation of the evidence is most persuasive, but whether the plan administrator's interpretation is unreasonable." *Clark v. Wash. Teamsters Welfare Trust*, 8 F.3d 1429, 1432 (9th Cir. 1993) (quotation omitted).

Defendant argues that the "totality of the medical records, IME findings, surveillance footage, in-person interview, and medical case management review demonstrated that as of August 2016, Plaintiff's functionality had improved significantly to the point where Plaintiff was no longer disabled as defined in the policy." Def. Resp. 33, ECF 44. While Defendant may not be required to establish that Plaintiff's condition improved after it originally determined that he was entitled to benefits, Defendant has *chosen* to rely on that rationale to explain its change in position here. Because that explanation is not reasonable based on the record as a whole, the Court finds that Defendant's decision to terminate benefits was an abuse of discretion.

---

[4] Because the Court concludes that Defendant's decision to terminate Plaintiff's benefits was unreasonable, the Court declines to address Plaintiff's additional argument that Defendant abused its discretion in its review of Plaintiff's appeal of that decision.

## A. Treating Physicians

"If an administrator terminates benefits based on plaintiff's improvement, one would expect the medical evidence to disclose an improvement." *Berteleson v. Hartford Life Ins. Co.*, 1 F.Supp.3d 1060, 1069 (E.D. Cal. 2014) (citing *Saffon*, 522 F.3d at 871) ("MetLife had been paying Saffon long-term disability benefits for a year, which suggests that she was already disabled. In order to find her no longer disabled, one would expect the MRIs to show an improvement").

Here, Defendant found Plaintiff disabled and paid benefits from 2005 to 2016. AR 144–51. In terminating Plaintiff's benefits, however, Defendant did not address its earlier conclusion that Plaintiff was disabled or the medical evidence that supported that conclusion. Rather, it stated that the decision was "based on the findings of our investigation, the documented inconsistencies between . . . reported limitations and observed activities and the medical documentation provided in our file." AR 148. Now, Defendant argues that Plaintiff's treating physicians documented improvement beginning in late 2015. In support of this argument, Defendant writes that Dr. Taylor

> noted no significant progression of motor symptoms over the past year and a half. He also noted that migraine headaches had decreased since starting topiramate in June 2014. (Black Claim File 000706).
> …
> Dr. Taylor's chart entries for 2016 demonstrated even further degrees of improvement in Plaintiff's conditions on medication. On May 31, 2016, Dr. Taylor's assessment was that Plaintiff did not have any facial features, shuffling feet, or resting tremor indicative of Parkinson's, but that he kept his left arm rigid when he sat and had some cogwheel rigidity. He noted that speech and cognition were normal and that balance "seemed pretty good although he does use a cane." There were no signs of involuntary movements. (Black Claim File 00416). Dr. Taylor noted Dr. Hammerstad's belief that Plaintiff had some sort of psychological disorder rather than Parkinson's, but ultimately concluded Plaintiff "probably" had atypical Parkinson's due to the cogwheel rigidity in the left arm and "gait disorder." Dr. Taylor stated that with increased dosage of topiramate, Plaintiff's migraines had "tapered off." (Id. at 000415).

Def. Mot. 26.

In addition,

although Dr. Wise's chart notes headaches, neck pain, and insomnia, as well as depression and anxiety, he noted that "[o]therwise, apart from his Parkinson's disease … he feels ok." (Black Claim File 000603). Parkinson's was felt to be fairly stable, as were headaches and generalized pain. On March 31, 2016, Dr. Wise saw Plaintiff for follow up for insomnia, Parkinson's, headaches, and mood problems. He stated that since the last visit, Plaintiff's mood had improved due to citalopram. He noted that some light sensitivity had also resolved. (Black Claim File 000602). On this visit, Dr. Wise reported that the patient was alert and oriented and that his cognition seemed intact. Dr. Wise's stated impression was "situational depression…much improved on meds"; "radiculopathy: referral to neurosurgeon as noted; other medical issues: as noted on previous visits." (*Id.* at 000603).

*Id.*

As an initial matter, many of these notations do not support the conclusion that Plaintiff's condition improved. For example, to the extent that Defendant relies on statements that Plaintiff's symptoms were "not progressing" or "stable," these descriptors are not synonymous with improvement. *See Montour*, 588 F.3d at 635 (finding that doctor's reliance on a "lack of progression (i.e., lack of further degeneration)" did not make sense; "[g]iven that Hartford found Montour disabled in 2004 and paid him benefits for over two years, '[i]n order to find [him] no longer disabled, one would expect the MRIs to show an improvement, not a lack of degeneration.'") (quoting *Saffon*, 522 F.3d at 871)).

Moreover, while Defendant notes that "Dr. Taylor's assessment was that Plaintiff did not have any facial features, shuffling feet, or resting tremor indicative of Parkinson's," Defendant does not indicate whether Plaintiff ever exhibited these symptoms to begin with. Without explaining how these symptoms have resolved—or improved—it appears to the Court that Defendant is simply relying on the fact that Plaintiff has been diagnosed with *Atypical* Parkinson's. Defendant cannot rely on "missing" symptoms to support the argument that

Plaintiff's condition improved, when Defendant cites no evidence to suggest those symptoms ever existed in the first place.

To the extent that Defendant relies on actual signs of improvement—such as fewer migraines or decreased light sensitivity—the Court finds that Defendant has cherry-picked the evidence. "'[C]herry picking' occurs when administrators fail to consider all the evidence, specifically excluding the consideration of evidence that might help the plaintiff's claim." *Mitchell v. Aetna Life Ins. Co.*, 359 F.Supp.2d 880, 891 (C.D. Cal. 2005); *see also Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832–33 (7th Cir. 2009) (holding administrator acted arbitrarily when it "cherry-picked" statements from the plaintiff's medical history that supported the decision to terminate her benefits, while ignoring evidence to support her disability). For example, Defendant identifies a progress note from Dr. Wise stating that Plaintiff's mood improved with medication and some of his light sensitivity had resolved. *See* AR 602–03. The note also states that "otherwise, apart from his Parkinson's disease (his disabling diagnosis) he feels ok." *Id.* at 602. First, the light sensitivity appears to have been a side effect of a new medication and therefore, in context, does not support "improvement" related to Plaintiff's underlying disability.  Second, as Plaintiff points out, "*apart from his Parkinson's disease*" is a significant qualifier. This note does not support Defendant's contention that Plaintiff "feels ok" as a general matter, but instead maintains that Plaintiff's medical issues remain "as noted on previous visit." AR 602. In the previous visit, Dr. Wise wrote that Plaintiff's Parkinson's symptoms included persistent and worsening neck and back pain, chronic headaches, insomnia, numbness, tingling, and cramps in his forearms and legs, and that Plaintiff continued to suffer from depression and anxiety. AR 606–08. At that time, he also referred Plaintiff to a pain management specialist. AR 607.

Moreover, Defendant does not address Dr. Maksimov's pain treatments that began in 2015. While Dr. Maksimov did not opine as to whether Plaintiff was disabled under the terms of his insurance policy, his medical records do not support Defendant's argument that Plaintiff improved to the point that he was no longer disabled. Plaintiff reported back and neck pain. AR 537. An MRI showed cervical disc degeneration. AR 535–36. Dr. Maksimov administered cervical epidural steroid injections. AR 582, 594. These injections provide only partial and temporary relief for Plaintiff's headaches and back pain. AR 582.

In sum, the records from Plaintiff's treating physicians do not support Defendant's argument that Plaintiff's symptoms improved in 2015 and 2016.

**B. IME**

Dr. Robert Egan was hired by Defendant—through third party vender MES—to produce an independent medical examination (IME). Dr. Egan watched the surveillance footage, reviewed Plaintiff's treatment records, and examined Plaintiff on June 14, 2016. In his report, he wrote that Plaintiff had normal muscle bulk and tone, no pronator drift, normal fine motor movements, and a distractible tremor. AR 493. He noted that Plaintiff had small writing, a twitching tremor in the left thumb, and a tapping tremor of the left foot. *Id.* He concluded that, based on his examination and the video surveillance, he believed that Plaintiff did not suffer from Parkinson's but rather had a functional tremor and was malingering. AR 494–95. When he issued his report on July 19, 2016, he opined that Plaintiff was not disabled. At Defendant's request, he amended that report to include additional information about malingering. AR 494.

Dr. Egan's report does not provide a reasonable basis for finding that Plaintiff's symptoms improved such that he was no longer disabled under the terms of the LTD policy. First, the Court notes discrepancies between Dr. Egan's conclusions and Defendant's use and

characterization of his report. After Dr. Egan concluded that Plaintiff was malingering, Defendant asked him to expand on this conclusion. However, Defendant did not deny benefits on the theory that Plaintiff was malingering. Rather, Defendant argues that Dr. Egan *implicitly* found improvement because he concluded that Plaintiff's "condition was better than as described in his prior medical records." Def. Reply 10. The plain reading of Dr. Egan's report does not support this argument.

Second, it is also unclear whether Dr. Egan possessed all relevant medical records. For example, the 2008 Functional Capacity Evaluation (FCE) was not listed among the documents he reviewed. *See* AR 492–95; 525. While it is possible, as argued by Defendant, that Dr. Egan meant the FCE when he referred to "another IME by another unknown physician," the Court will not make this assumption without further support (especially given that the FCE was not prepared by a physician). *See* AR 493. Dr. Egan also did not indicate that he reviewed, or was provided with, the SSA opinion favorable to Plaintiff. While both the FCE and SSA decision were old, Dr. Egan was provided with—and relied on—even older treatment reports less favorable to Plaintiff. *See* AR 494 (Dr. Egan wrote that Dr. Hammerstad's note from February 2006 supported his diagnosis of a functional tremor rather than Parkinson's disease).

Finally, while he may not have possessed all medical records in evidence, Dr. Egan relied heavily on the surveillance video. For the reasons below, the Court finds the surveillance video of minimal probative value. Thus, Dr. Egan's reliance on the video weighs against finding that his opinion provided a reasonable basis to terminate benefits. *See Montour*, 588 F.3d at 633–34 (finding that "Hartford's bias infiltrated the entire administrative decision-making process," in part because a doctor overemphasized the surveillance footage that Hartford also overstated and over-relied on).

### C. Surveillance Video

On January 8 and January 18, 2016, HUB—an outside vender hired by Defendant—conducted sixteen hours of surveillance of Plaintiff. AR 1266. On January 8, Plaintiff left his house, boarded a bus, and spent approximately five hours away from home. AR 1271–75. Plaintiff was observed entering stores, making purchases, and getting a haircut. *Id.* Plaintiff was not observed leaving his home on January 18th. *Id.* at 1275. Defendant claims this video shows that "Plaintiff's ability to perform physical and mental tasks [is] directly at odds with his claimed restrictions and limitation." Def. Mot. 28.

Courts may rely on video surveillance footage when analyzing disability claims under ERISA. *Finley v. Hartford Life & Acc. Ins. Co.*, 400 F. App'x 198, 200–01 (9th Cir. 2010) (mem) (upholding denial of benefits after defendant conducted surveillance and plaintiff gave contradictory explanations for her activities); *Bender v. Hartford Life Ins. Co.*, No. C 09–01163 MMC, 2011 WL 3566483, at *15 (N.D. Cal. Aug. 12, 2011) (affirming denial of benefits where video surveillance contradicted plaintiff's representation of disability). In *Finley*, for example, the court noted that while the plaintiff "claimed to have constant disabling pain in her hands, arms, shoulders, mid to upper back, and neck that increased with mild physical activities, such as normal household chores, shopping, and holding a telephone," video "showed her vigorously pulling weeds in kneeling and squatting positions, lifting and carrying objects using both her arms, raising her arms over her head to point and carry objects, and using tools to scrape, push, and pull without any apparent difficulty." *Finley*, 400 F. App'x at 199. The video therefore showed the plaintiff performing vigorous activities "in a way that far exceeded her reported abilities"—and led physicians to conclude that she could perform more work than claimed. *Id.* at

200. Moreover, the court recognized that the video severely damaged the plaintiff's credibility. This was compounded by the fact that,

> [i]mmediately before Finley saw the video, she signed a statement attesting that she had been unable to perform even mild physical activity for the past six months. After seeing the video, Finley gave several contradictory explanations for her activities. First she said that she was in severe pain while performing the activities, but then later said that she was able to do them because she was in a period of feeling better. She also stated that it took her two weeks to recover from the gardening, despite the fact that she walked her dogs for over an hour and brushed them down the next day.

*Id.* at 200–01.

However, courts should not overly rely on surveillance video, particularly where a plaintiff's reported restrictions are consistent with the video surveillance. *Montour*, 588 F.3d at 633 ("that Plaintiff could perform sedentary activities in bursts spread out over four days does not indicate that he [] is capable of sustaining activity in a full-time occupation."); *Bertelsen v. Hartford Life Ins. Co.*, 1 F.Supp.3d 1060 (E.D. Cal. 2014).

Here, Defendant overstates the surveillance findings. Defendant contracted with HUB to conduct sixteen hours of surveillance over two days. From those sixteen hours, including five hours where Plaintiff was away from his house, HUB returned less than sixteen minutes of footage. Moreover, as Plaintiff points out, those sixteen minutes are comprised of small clips, that frequently last less than a minute each. The Court thus finds the video ambiguous at most, and misleading at worst.

Even so, unlike the plaintiff in *Finley*, Plaintiff's activities here do not show he is capable of maintaining work and are not necessarily inconsistent with Plaintiff's reported limitations. Plaintiff is recorded riding a bus and running errands. These errands include getting a haircut, using ATMs, and purchasing food. Defendant provides no explanation for how these activities

might translate to the work environment. While Dr. Egan opined, after seeing the video, that Plaintiff was not disabled, Plaintiff's treating physician, Dr. Wise, did not agree.

The Court is also not convinced that Plaintiff's activities contradict his reported symptoms or limitations. As a preliminary matter, while Defendant describes Plaintiff's demeanor and conduct with words such as "deft," "quick," "brisk," and "happy," Plaintiff interprets the video quite differently. Plaintiff points out that, consistent with his allegations, he used a cane and wore tinted glasses throughout the video (except when getting his haircut). At times, the video also appears to be filmed from a significant distance.

Defendant relies primarily on a 2015 questionnaire to argue that the surveillance video is inconsistent with Plaintiff's stated limitations. AR 733–42. In this questionnaire, Plaintiff stated that he moves slowly and clumsily, and that he doesn't have good fine control with his hands or the ability to carry things easily. AR 738. He also reported severe migraines that resulted in "many days [where he] can't leave home or do any activities." *Id.* On days with these migraines, he reported spending the entire day in bed with earplugs and an eye mask, and that "any sound or light [was] unbearable." *Id.*

However, these broad statements were clarified and expanded upon, at Defendant's request, in an interview with Defendant's investigator. While, like the plaintiff in *Finley*, the interview occurred after Plaintiff was secretly recorded, here, Plaintiff's responses do not damage his credibility. Plaintiff stated that, on a good day, he can walk at most thirty minutes in one setting; nothing in the video contradicts that statement. AR 640. He stated that he could sometimes run multiple errands at a time, carry a gallon of milk, reach his hands in front of him, use his hands and fingers when there was no numbness or muscle lock, and even occasionally play music (within limits). AR 640–46. He also stated he could write with a pen, type, and use a

computer. AR 646. These descriptions squarely align with Plaintiff's recorded activity. The video shows Plaintiff walking, and sometimes shuffling, with a noticeable limp and a cane for support. At one point, Plaintiff even grabs onto a bus stop and stretches his leg in obvious discontent. While Dr. Egan opined that Plaintiff's displayed a shorter stride in person than on the video, the Court notes that the video shows different length strides depending on Plaintiff's activities in the moment.

In sum, the Court finds that the surveillance video evinces a level of functioning that is entirely consistent with Plaintiff's own self-reported limitation. Defendant's overstatement and over-reliance on this surveillance weighs against Defendant's decision to terminate benefits. *See Montour*, 588 F.3d at 633 ("signs of bias" included Hartford's decision to "overstate[] and over-rel[y] on surveillance of Plaintiff," and this "bias infiltrated the entire administrative decision-making process, which leads us to accord significant weight to the conflict.").

### D.  Contrary SSA disability determination

Defendant's failure to explain the Social Security Administration (SSA) decision that found Plaintiff disabled also weighs against its decision to terminate benefits. The failure to provide a full explanation for the difference between the SSA's finding of disability and an ERISA plan administrator's finding of non-disability is not a reversible error per se. *Salz v. Standard Ins. Co.*, 554 F. App'x 600, 602 (9th Cir. 2014). However, the failure to meaningfully evaluate a Social Security disability award is a "significant error that the district court must appropriately weigh in determining whether a plan administrator abused its discretion." *Id.*

In *Montour*, for example, "Hartford acknowledged the SSA's decision but did not articulate why the SSA might have reached a different conclusion." *Montour*, 588 F.3d at 635. "Ordinarily, a proper acknowledgment of a contrary SSA disability determination would entail

comparing and contrasting not just the definitions employed but also the medical evidence upon which the decision-makers relied." *Id.* As the Ninth Circuit has explained,

> [w]hile ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was the product of a principled and deliberative reasoning process. In fact, not distinguishing the SSA's contrary conclusion may indicate a failure to consider relevant evidence.

*Id.* at 636 (internal citations and quotations omitted).

Here, the LTD policy required Plaintiff to apply for Social Security disability benefits from the SSA when directed to do so. AR 18. If denied, it required Plaintiff to exhaust all possible appeals. AR 18. Defendant directed Plaintiff to apply for Social Security benefits and Plaintiff did so. AR 312. On August 10, 2009, the SSA concluded that Plaintiff was disabled and awarded him disability benefits retroactive to February 1, 2006. AR 951. As a result, Defendant's monthly payments were reduced by $810, and it recovered approximately $24,000 in overpayment from Plaintiff. AR 241.

While Defendant benefitted from Plaintiff's receipt of Social Security benefits, it is not clear that Defendant considered the SSA decision in its own review of Plaintiff's benefits. Instead, the denial of benefits letter states only that:

> As we discussed with you, it is possible to qualify for SSD, but no longer continue to qualify for private long-term disability (LTD) benefits from The Hartford. The standards governing these public and private benefits are different in critical ways. In determining entitlement to SSD, the Social Security Administration (SSA) measures your condition against a unique set of federal criteria. By contrast, continued qualification for benefits under your private LTD policy depends in part on the consistent interpretation of the specific terms in that policy. Therefore, while The Hartford considers the SSA's disability determination as one piece of relevant evidence, the SSA's determination is not conclusive.

AR 146.

Now, Defendant argues that the favorable SSA decision is not relevant because it is too old: the SSA decision was issued in 2009, and Defendant terminated Plaintiff's benefits in 2016. Defendant also argues it did not disregard the letter but "simply put it in the proper context as a decision based on different standards." Def. Resp. at 32. However, the letter does not reference the age of the SSA decision or explain the significance of these different standards. While the age of the decision does make this evidence less probative, it does not deprive the evidence of all value. And, the Court notes that Dr. Egan's report—on which Defendant relies heavily—in turn relies on medical records from three years *before* the SSA decision was issued. *See* AR 150 ("We have concluded from the combination of all the medical information in your file that you are able to perform full time work within the restrictions and limitations provided by Dr. Egan"); AR 494 (Dr. Egan wrote that Dr. Hammerstad's note from February 2006 supported his diagnosis of a functional tremor rather than Parkinson's disease); *see also Robertson*, 139 F.Supp.3d at 1206 ("In short, [defendant] eagerly accepted the outcome of the SSA's determination but turned a blind eye to the reasons behind that determination.").

Defendant does not articulate any other reason for reaching a different conclusion from the SSA. Defendant's statement regarding standards does not provide Plaintiff with any meaningful understanding for why Defendant rejected the SSA determination or how Plaintiff could supplement the record on appeal.

In sum, Defendant's failure to adequately consider the SSA decision weighs against Defendant's decision to terminate benefits. Like in *Montour*, Defendant required Plaintiff to apply for Social Security benefits and after the Social Security award was issued, Defendant terminated Plaintiff's LTD benefits. *See* 588 F.3d at 637. With the record here—including nine years of LTD payments and Defendant's unsupported argument that Plaintiff's symptoms

showed signs of "improvement"—the Court finds that the unaddressed SSA decision weighs

against the conclusion that Defendant's decision to terminate benefits was reasonable.

### V. The Court Orders an Award of Reinstatement of Benefits.

Defendant owed a fiduciary duty to Plaintiff under ERISA.

> [A] fiduciary responsibility under ERISA is simply stated. The statute provides that fiduciaries shall discharge their duties with respect to a plan "solely in the interest of the participants and beneficiaries,'' [29 U.S.C.] § 1104(a)(1), that is, "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan," § 1104(a)(1)(A).

*Pegram v. Herdrich*, 530 U.S. 211, 223–24 (2000). Fiduciaries must discharge their duties "with

the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent

man acting in a like capacity and familiar with such matters would use in the conduct of an

enterprise of a like character and with like aims." *Id.* at 224 n.6. (quoting 29 U.S.C. §

1104(a)(1)(B)).

"Remand to the plan administrator is appropriate where that administrator has

'construe[d] a plan provision erroneously' and therefore has 'not yet had the opportunity of

applying the [p]lan, properly construed, to [a claimant's] application for benefits.'" *Canseco v.*

*Constr. Laborers Pension Trust*, 93 F.3d 600, 609 (9th Cir. 1996) (quoting *Saffle v. Sierra Pac.*

*Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 461 (9th Cir.

1996)). In cases where the plan administrator has abused its discretion when denying a claim for

disability that was supported by the record, however, courts have ordered payment of benefits on

the ground that the administrator should not be given a second chance. *See, e.g.*, *Cooper v. Life*

*Ins. Co. of No. Amer.*, 486 F.3d 157, 172 (6th Cir. 2007) ("Plan administrators should not be

given two bites at the proverbial apple where the claimant is clearly entitled to disability benefits.

They need to properly and fairly evaluate the claim the first time around."). In *Fleet v.*

*Independent Federal Credit Union*, the district court wrote:

> If the procedure were to become routine, it would pose a serious risk of simply allowing "Mulligans" to sloppy plan administrators—at the expense of both the courts and plan participants and beneficiaries . . . . "It would be a terribly unfair and inefficient use of judicial resources to continue remanding a case to [the plan administrator] to dig up new evidence until it found just the right support for its decision to deny an employee her benefits."

No. 1:04CV0507DFHTAB, 2005 WL 1183177, at *3 (S.D. Ind. May 18, 2005) (quoting

*Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 832 (7th Cir. 2004)).

The situation here is not one in which the plan administrator failed to apply the plan

provisions properly. Instead, as noted, even under the most deferential abuse-of-discretion

standard of review, Defendant's denial of Plaintiff's claim is the result of a mischaracterization of

Plaintiff's treating physicians' opinions and records; unjustified reliance on the report of an

independent medical examiner; overreliance and overstatement of surveillance footage; and the

failure to fully consider a contrary SSA determination. Defendant fell short of fulfilling its

fiduciary duty to Plaintiff. The Court, therefore, concludes it should not permit Defendant to

have another "bite at the apple" and that an award of reinstatement of benefits is appropriate.

//

//

//

//

//

//

//

//

CONCLUSION

The Court grants Plaintiff's Motion for Summary Judgment [34], denies Defendant's Motion for Summary Judgment [32], and orders judgment in favor of Plaintiff for a reinstatement of benefits. Plaintiff shall prepare an appropriate Judgment consistent with this Opinion and, after conferring with Defendant, shall submit it to the Court for signature within 10 days of the date below.

IT IS SO ORDERED.

Dated this 10 day of June , 2019.

MARCO A. HERNÁNDEZ
United States District Judge